# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 15-3557 JB

PETE PASQUAL CHAVEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Petition for Revocation of Supervised Release, filed December 20, 2022 (Doc. 50)("Petition").   In the Petition, the United States Probation Office ("USPO") alleges that Defendant Pete Pasqual Chavez has violated two of his mandatory supervised release conditions: (i) that he not commit another federal, state, or local crime; and (ii) that he not unlawfully possess a controlled substance.  See Petition at 1-2.  The Court held a hearing on March 14, 2023.  See Violation of Supervision Proceedings Minute Sheet at 1, filed March 14, 2023 (Doc. 67)("Clerk's Minutes").  At the hearing, Chavez denied that he violated the two mandatory supervised release conditions.  See Clerk's Minutes at 1.  The primary issue is whether Plaintiff United States of America has met its burden to prove by a preponderance of the evidence that Chavez violated each of the mandatory supervised release conditions.   The Court concludes that Chavez violated both supervised release conditions.  Accordingly, Chavez' revocation range of imprisonment is 24 months.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must

state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d)'s purposes. The Court makes these findings by a preponderance of the evidence. See 18 U.S.C. § 3583(e)(3). Rule 32.1(b)(2)(C) of the Federal Rules of Criminal Procedure afford defendants "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). The Federal Rules of Evidence do not apply to revocation proceedings. See United States v. Henry, 852 F.3d 1204, 1206 (10th Cir. 2017). Instead, in making these findings, the Court does not consider any evidence or testimony from the hearing that violates the balancing test that the United States Court of Appeals for the Tenth Circuit adopted in United States v. Jones, 818 F.3d 1091, 1098 (10th Cir. 2016). "When applying the balancing test, the Court must weigh the defendant's interest in cross-examining and confronting [a] witness with the government's good cause for not presenting the witness." United States v. Hernandez, 428 F. Supp. 3d 775, 788 (D.N.M. 2019)(Browning, J.)(citing United States v. Jones, 818 F.3d at 1098).

      **1.**    **Chavez' Supervised Release.**

      1.    On March 23, 2016, the Court sentenced Chavez to 84 months of imprisonment, followed by a supervised release term of 2 years, after Chavez pled guilty to a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) for being a felon in possession of a firearm and ammunition. See Sentencing Minute Sheet at 1, filed March 23, 2016 (Doc. 33); Plea Agreement ¶ 3, at 2, filed December 23, 2015 (Doc. 26).

      2.    Chavez began his supervised release term on December 30, 2021. See Violation Report, filed December 20, 2022 (Doc. 51).

3.      One of Chavez' mandatory supervised release conditions was that he not commit another federal, State, or local crime.  See Draft Transcript of Hearing at 80:24-81:2 (taken March 14, 2023)("Tr.")(Burkhead, Villalobos).[1]

4.      Another of Chavez' mandatory supervised release conditions was that he not unlawfully possess a controlled substance.  See Tr. at 81:3-5 (Burkhead, Villalobos).

5.      Chavez' conditions also included that he submit to drug testing.  See Tr. at 83:14-18 (Gallegos, Villalobos).

6.      Until this incident in December, 2022, Chavez had been in compliance with his conditions of supervised release.  See Tr. at 83:11-13 (Gallegos, Villalobos).

7.      The United States Probation Officer ("USPO") assigned to Chavez, Karina Villalobos, conducted approximately seven home visits with Chavez, during which she did not observe anything concerning.  See Tr. at 83:21-84:12 (Gallegos, Villalobos); id. at 87:22-25 (Burkhead, Villalobos).

8.      In March, 2022, Chavez moved into a residence at 210 Arizona Street, in Belen, New Mexico.  See Tr. at 88:3-7 (Burkhead, Villalobos).

9.      Belen is in Valencia County.  See Municipalities, Valencia County, NM, https://www.co.valencia.nm.us/260/Municipalities (last visited August 1, 2023).

10.     Villalobos' most recent home visit with Chavez was on October 25, 2022.  See Tr. at 86:9-16 (Gallegos, Villalobos).

---

[1]The Court's citations to the transcript of the March 14, 2023, hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

2.      **The Investigation into 210 Arizona Street**.

11.      Beginning in the summer of 2022, law enforcement officers from the Belen Police Department and the Valencia County Sheriff's Office became aware of Chavez through numerous community complaints associated with his address, 210 Arizona Street.  See Tr. at 34:10-36:25 (Burkhead, Robinson).

12.      The complaints include that 210 Arizona Street "was a problem house or a nuisance house," and that "there was traffic in and out of this house all hours of the night, and unwanted visitors from the public."  Tr. at 34:13-16 (Robinson).

13.      Officers from the Belen Police Department, in collaboration with the Valencia County Sheriff's Community Response Impact Team, opened a narcotics investigation on 210 Arizona Street.  See Tr. at 35:15-23 (Robinson).

14.      Officer Christopher Robinson, a police officer with the Belen Police Department, was the lead officer on the case.  See Tr. at 11:4-7 (Burkhead, Fillmore); id. at 37:21-23 (Burkhead, Robinson).

15.      Part of the investigation included making controlled buys from 210 Arizona Street.  See Tr. at 54:10-14 (Gallegos, Robinson).

16.      Chavez never conducted any of the controlled buys.  See Tr. at 54:15-17 (Gallegos, Robinson).

17.      On December 14, 2022, the officers obtained a State search warrant for 210 Arizona Street.  See Tr. at 37:1-9 (Burkhead, Robinson).

18.      The search warrant authorized the officers to search for narcotics equipment or paraphernalia, for substances used to make or manufacture narcotics, for money, and for identifying documents.  See Tr. at 37:12-15 (Robinson).

### 3.      **The High-Speed Pursuit.**

19.      On December 16, 2022, at approximately 6:30 a.m., Robinson and Officer Andrew Fillmore, a police officer with the Belen Police Department, were involved in executing a search warrant at 210 Arizona Street.  See Tr. at 6:24-8:14 (Burkhead, Fillmore); id. at 9:1-3 (Burkhead, Fillmore); id. at 16:24-25 (Fillmore).

20.      Sheriff's deputies from the Valencia County Sheriff's Department also were involved in executing the search warrant.  See Tr. at 9:25-10:1 (Fillmore).

21.      Robinson and Fillmore's roles were to provide perimeter support for the search warrant team.  See Tr. at 9:18-21 (Burkhead, Fillmore); id. at 38:25-39:3 (Robinson).

22.      Fillmore was in a marked police vehicle and in his duty uniform.  See Tr. at 10:2-4 (Fillmore).

23.      As the officers approached 210 Arizona Street, a black truck passed the officer, turning off Arizona Street and onto Wisconsin Street.  See Tr. at 9:25-10:13 (Burkhead, Fillmore).

24.      Chavez was driving the black truck.  See Tr. at 11:24-12:3 (Burkhead, Fillmore); id. at 39:21-34 (Burkhead, Robinson).

25.      Robinson advised Fillmore that the black truck might have been their target and directed Fillmore to locate the truck.  See Tr. at 10:4-7 (Fillmore); id. at 10:21-11:3 (Burkhead, Fillmore); id. at 40:18-24 (Robinson).

26.      Fillmore turned around to begin following the black truck, but lost visibility of the truck.  See Tr. at 11:18-20 (Fillmore).

27.      Fillmore began to attempt to locate the black truck.  See Tr. at 12:6-7 (Fillmore).

28.     The other officers continued the search warrant's execution by clearing the house at 210 Arizona Street, conducting a protective sweep, and conducting a secondary sweep of the house.  See Tr. at 41:9-12 (Robinson).

29.     Once the residence was secure and the officers had formed a perimeter around the house, Robinson asked Chief James Harris for permission to join in the pursuit of the black truck.  See Tr. at 41:12-19 (Robinson).

30.     Harris gave Robinson permission to pursue and instructed that Robinson would become the secondary officer and take over communications.  See Tr. at 41:19-23 (Robinson).

31.     As Fillmore traveled southbound on East Frontage Road in Belen's north end, the black truck passed him going the other direction.  See Tr. at 12:7-11 (Fillmore).

32.     Upon seeing the black truck, Fillmore turned around and ran the truck's license plate.  See Tr. at 12:12-15 (Buckhead, Fillmore).

33.     The black truck's license plate was registered to Chavez and to 210 Arizona Street, which indicated to Fillmore that the truck belonged to Chavez, whom the officers were seeking.  See Tr. at 12:14-18 (Fillmore).

34.     Upon identifying the black truck, Fillmore advised Harris that Fillmore was conducting a traffic stop of the truck.  See Tr. at 12:25-13:3 (Fillmore).

35.     Up to this point, Fillmore had not observed Chavez engage in any traffic violations.  See Tr. at 27:19-21 (Fillmore).

36.     When Fillmore initiated the stop at approximately 6:57 a.m., "the vehicle didn't stop right away."  Tr. at 13:3 (Fillmore).  See id. at 17:10-11 (Fillmore).

37.     The black truck stopped eventually near Highway 314 and Tijeras Road in Belen.  See Tr. at 13:25-14:10 (Burkhead, Fillmore).

38.     Chavez was aware that Fillmore had given him a signal to stop.[2]

39.     Harris directed Fillmore to conduct a felony traffic stop.  See Tr. at 13:9-10 (Fillmore).

40.     A felony traffic stop is a traffic stop where the officer draws his or her weapon and verbally commands the vehicle's drive to exit the vehicle without approaching the vehicle. See Tr. at 13:12-18 (Fillmore).

41.     Felony traffic stops are not the usual method for stopping a vehicle.  See Tr. at 30:17-20 (Fillmore).

42.     In response to the stop, Chavez shouted "What for?"  Tr. at 15:17 (Fillmore).

43.     Chavez' comments do not demonstrate fear of immediate and great bodily harm.[3]

44.     Fillmore gave Chavez commands for fifteen to twenty seconds, at which point Chavez fled northbound on Highway 314.  See Tr. at 15:23-16:2 (Burkhead, Fillmore).

45.     Fillmore gave chase.  See Tr. at 16:4 (Fillmore).

46.     Chavez led Fillmore north to Los Chavez, New Mexico, a community approximately three to four miles north of Belen and between Belen and Los Lunas, New Mexico.  See Tr. at 16:15-17:1 (Burkhead, Fillmore).

47.     Chavez was driving "extremely fast and recklessly," approximately seventy-five miles per hour in a fifty-five mile per hour zone.  Tr. at 17:2-8 (Burkhead, Fillmore).

48.     Because the workday was beginning, there was traffic on the road.  See Tr. at 17:12-13 (Fillmore).

---

[2]The Court reaches this conclusion in its analysis below.

[3]The Court reaches this conclusion in its analysis below.

49.     Chavez entered a neighborhood in Los Chavez and led Fillmore through the neighborhood.  See Tr. at 17:16-21 (Fillmore).

50.     Chavez approached a loop which he circled twice, at which point an unidentified female exited the vehicle and fled.  See Tr. at 17:22-25 (Fillmore).

51.     Fillmore advised dispatch of the female's presence but continued chasing Chavez. See Tr. at 17:25:18:2 (Fillmore).

52.     Chavez exited the neighborhood and got back on Highway 314 heading south towards Belen.  See Tr. at 19:9-10 (Fillmore); id. at 19:19-22 (Burkhead, Fillmore).

53.     As Chavez and Fillmore returned to Belen, Chavez traveled at speeds between eighty to one-hundred miles per hour.  See Tr. at 20:4-6 (Fillmore).

54.     Fillmore contacted his supervisor and requested that fellow Belen police officers converge on Belen's north end and set up stop sticks.  See Tr. at 19:10-14 (Fillmore).

55.     A stop stick is a device which officers use to bring pursuits to a close that deflates a vehicle's tires when the vehicle drives over the stick.   See Tr. at 19:15-18 (Burkhead, Fillmore).

56.     Robinson and Belen Police Officer Andre C de Baca set up stop sticks on the intersection of Highway 314 and the I-25 Bypass.  See Tr. at 20:18-20 (Fillmore); id. at 42:7-9 (Robinson).

57.     As Chavez approached the stop sticks, he jumped over the highway's dirt median to avoid the intersection and got onto the East Frontage Road travelling south.  See Tr. at 20:20-21:1 (Fillmore); id. at 21:13-14 (Fillmore).

58.     In making this maneuver, Chavez almost collided with Fillmore's day shift supervisor, Sergeant Guy Solinger, who was in his vehicle.  See Tr. at 21:1-2 (Fillmore); id. at 22:7-11 (Burkhead, Fillmore).

59.     Solinger was attempting to get to Gabaldon Road to prevent Chavez from going down that road.  See Tr. at 22:11-13 (Fillmore).

60.     Robinson collected his stop sticks, initiated his lights and sirens, and joined the pursuit of Chavez' vehicle.  See Tr. at 42:20-24 (Robinson).

61.     Chavez continued down the East Frontage Road until reaching the I-25 Bypass, at which point he got onto I-25 Bypass westbound heading towards I-25.  See Tr. at 22:16-24 (Burkhead, Fillmore).

62.    The following map, with the red lines indicating the stop sticks' approximate location, represents Chavez' path as he drove south into Belen and west towards I-25:



See Google Maps, https://www.google.com/maps/ ((last visited August 1, 2023).

63.     Upon reaching I-25, Chavez got onto the interstate traveling southbound.  See Tr. at 23:16-17 (Fillmore).

64.     While traveling on I-25, Chavez surpassed 115 miles per hour.  See Tr. at 23:21-23 (Fillmore); id. at 43:7-18 (Burkhead, Robinson).

65.     Chavez travelled south for approximately twenty miles until reaching the exit for Highway 60, at which point he exited I-25 and got onto I-25 again, this time going northbound towards Belen.  See Tr. at 24:7-19 (Fillmore).

66.     The Socorro County Police Department became involved in the chase, because the Highway 60 exit is located in Socorro County.  See Tr. at 24:9 (Fillmore); id. at 24:20-21 (Fillmore).

67.     Chavez continued travelling at speeds above one-hundred miles per hour.  See Tr. at 24:22 (Fillmore).

68.     Upon returning to Belen, Chavez exited at Exit 191 onto eastbound Camino del Llano.  See Tr. at 24:22-25:5 (Burkhead, Fillmore).

69.     Camino del Llano is a major thoroughfare and trucking route in Belen.  See Tr. at 25:5-6 (Fillmore).

70.     Upon reaching a red light at the intersection of Camino del Llano and South Main Street, Chavez ran the red light and turned left to head north on South Main Street.  See Tr. at 25:7-10 (Fillmore).

71.     There were other cars on the road, and Fillmore had to slam on his brakes to avoid traffic.  See Tr. at 25:19-26:2 (Burkhead, Fillmore).

72.     Chavez turned right off South Main Street onto East Reinken Avenue, travelled down the road, turned left on Wisconsin Street, and finally turned left onto Arizona Street before

returning to 210 Arizona Street, where the officers originally spotted the black truck.  See Tr. at 26:4-16 (Burkhead, Fillmore).

73.     In total, the pursuit lasted for approximately thirty-nine minutes.  See Tr. at 18:14-15 (Fillmore).

74.     Fillmore's lights and sirens were active throughout the pursuit.  See Tr. at 18:14-15 (Fillmore).

75.     Upon reaching 210 Arizona Street, Chavez stopped in the middle of the road, because members of the Valencia County Special Weapons and Tactics ("SWAT") Team were waiting at the residence with rifles "at a low ready."  Tr. at 44:2-6 (Robinson).

76.     While the SWAT officers gave Chavez commands, the officers who had been pursuing him pulled up behind him.  See Tr. at 44:7-10 (Robinson).

77.     At that point, Chavez was removed from the black truck and placed under arrest. See Tr. at 44:14-17 (Burkhead, Robinson).

78.     Chavez' actions during the pursuit indicate that he was driving his truck willfully and carelessly.[4]

79.     Chavez violated N.M.S.A.  § 30-22-1.1(A) for aggravated fleeing of a law enforcement officer.[5]

80.     Police officers pull over more than twenty-million drivers every year.  See Findings, Stanford Open Policing Project, https://openpolicing.stanford.edu/findings/ (last visited August 11, 2023).

_____

[4]The Court reaches this conclusion upon consideration of the relevant facts in its analysis below.

[5]The Court reaches this conclusion in its analysis below after applying the relevant facts to the applicable law.

81.     Killings at traffic stops occur at a rate of approximately 1,000 deaths per year. See David D. Kirkpatrick, Steve Eder & Kim Barker, Cities Try to Turn the Tide on Police Traffic Stops, N.Y. Times (April 15, 2022), https://www.nytimes.com/2022/04/15/us/police-traffic-stops.html.

82.     In 2012, State and local law enforcement agencies conducted an estimated 68,000 vehicle pursuits.   See Brian A. Reaves, Bureau of Justice Statistics, Special Report: Police Vehicle Pursuits, 2012-2013. U.S. Dep't of Just. (May 2017).

83.     Chavez has not demonstrated that he feared immediate and great bodily harm.[6]

84.     Chavez did not act reasonably when he fled Fillmore's initial traffic stop.[7]

85.     Chavez did not flee from Fillmore under duress.[8]

**4.      The Officers' Search of 210 Arizona Street.**

86.     In total, there were "three certified law enforcement officers, two [ranked] commanding officers [], and one medic," involved with the search.  Tr. at 57:25-58:4 (Gallegos, Robinson).

87.     Upon executing the search warrant, the officer found six or seven people inside the residence, including two young children.  See Tr. at 45:7-10 (Robinson).

88.     210 Arizona Street's residence is a single-family residence with three main bedrooms.  See Tr. at 39:4-6 (Burkhead, Robinson); id. at 45:14-17 (Burkhead, Robinson).

---

[6]The Court reaches this conclusion upon consideration of the relevant facts in its analysis below.

[7]The Court reaches this conclusion upon consideration of the relevant facts in its analysis below.

[8]The Court reaches this conclusion in its analysis below after applying the relevant facts to the applicable law.

89.     Based on the investigation's earlier phases, the officers already were aware which bedroom belonged to Chavez.  <u>See</u> Tr. at 45:18-46:1 (Burkhead, Robinson); <u>id.</u> at 60:8-13 (Gallegos, Robinson).

90.     The officers were able to confirm which bedroom belonged to Chavez after entering a padlocked bedroom, in which they found Chavez' identifying documents, pictures, and, in the closet, work uniforms with his name on them.  <u>See</u> Tr. at 46:1-5 (Robinson); <u>id.</u> at 49:8-10 (Robinson).  <u>See also</u> Tr. at 88:15-21 (Burkhead, Villalobos)(confirming at the hearing that the officers had described the correct bedroom as belonging to Chavez).

91.     The officers also located a purse under the bed.  <u>See</u> Tr. at 46:15-16 (Robinson).

92.     Inside the purse was a photo identification card belonging to Brittany Williams. <u>See</u> Tr. at 62:23-63:7 (Gallegos, Robinson).

93.     Williams was inside the house when the officers executed the search warrant.  <u>See</u> Tr. at 72:2-6 (Burkhead, Robinson).

94.     Inside the purse were approximately thirty small blue pills marked with M and 30, which is consistent with fentanyl, and a white crystalline substance.  <u>See</u> Tr. at 46:16-21 (Robinson).

95.     Thirty pills is "a distribution amount."  Tr. at 46:17 (Robinson).  <u>See</u> <u>id.</u> at 46:22-47:3 (Burkhead, Robinson).

96.     The officers field tested the pills, which tested presumptively positive for fentanyl.[9]  <u>See</u> Tr. at 53:1-5 (Burkhead, Robinson).

_____

[9]A field test is a disposable prepackaged test kit, the packaging of which indicates for which substance the kit is designed to test, as well as what color the test kit will turn when it tests presumptively positive for the relevant substance.  <u>See</u> Tr. at 64:6-12 (Robinson).  Officers swab the substance or drop particles into a pouch-like container which contains several tubes, seal the

97.     The officers field tested the white crystalline substance, which returned a presumptively positive result for methamphetamine.  See Tr. at 47:10-18 (Burkhead, Robinson).

98.     Robinson also found two hypodermic syringes in the purse which contained a brown substance.  See Tr. at 51:17-18 (Robinson).

99.     The officers field tested the brown substance, which tested presumptively positive for heroin.  See Tr. at 51:18-19 (Robinson).

100.    In the closet in Chavez' bedroom, Robinson found what he believed to be "a large amount of magic mushrooms," specifically psilocybin mushrooms, which are a controlled substance.  Tr. at 49:7-24 (Burkhead, Robinson).

101.    Robinson did not field test the mushrooms.  See Tr. at 65:20-21 (Robinson).[10]

102.    Robinson also found in the closet approximately one pound of methamphetamine that was single-packaged, heat- and vacuum-sealed, and rolled up and hidden inside of a freshly tailored suit jacket's sleeve.  See Tr. at 50:12-51:6 (Burkhead, Robinson).

103.    The officers field-tested the bundle, which tested presumptively positive for methamphetamine.  See Tr. at 51:7-10 (Burkhead, Robinson).

104.    The bundle's weight was just over one pound.  See Tr. at 51:4-6 (Robinson).

105.    That amount is consistent with distribution amounts of methamphetamine.  See Tr. at 75:11-18 (Burkhead, Robinson).

---

container, and burst the tubes one at a time, agitating the container each time.  See Tr. at 64:13-19 (Robinson).  Then, "[u]sually right after, immediately after busting the third tube, if it's positive," the test will change colors to the color indicated on the packaging.  Tr. at 64:22-24 (Robinson).

[10]Robinson could not remember the weight of the mushrooms which he found.  See Tr. at 50:3-5 (Burkhead, Robinson).

106.    Elsewhere in Chavez' room, the officers located thousands of dollars in cash and other currencies rolled up in socks, clothing, and "just hidden around the room."  Tr. at 48:3-4 (Robinson).  See id. at 47:24-48:4 (Robinson).

107.    Robinson also found some drug paraphernalia in the room, including syringes, hypodermic needles, and pipes.  See Tr. at 51:11-14 (Burkhead, Robinson).

108.    Other than the syringes that Robinson found in the purse which had a substance that tested presumptively positive as heroin, Robinson could not tell whether the other syringes were used.  See Tr. at 51:19-21 (Robinson).

109.    The only contraband that the officers seized from the house came from Chavez' bedroom.  See Tr. at 59:23-25 (Gallegos, Robinson).

110.    On Chavez' person, the officers discovered somewhere between $2,000.00 and $3,000.00 in cash.  See Tr. at 48:12-13 (Robinson).

111.    The cash's denominations were largely in the form of $20.00, $5.00, and $1.00 bills.  See Tr. at 48:1 (Robinson); id. at 48:20-23 (Robinson).

112.    Those small denominations "are indicative of someone who is involved in criminal activity, specifically drug trafficking or distribution."  Tr. at 49:1-3 (Robinson).

113.    The officers also conducted a sweep of the black truck that Chavez had been driving, before sealing it and sending it to a secure bay to await a search warrant.  See Tr. at 48:9-11 (Robinson).

114.    The Belen Police Department eventually secured a search warrant for the truck. See Tr. at 51:24-52:1 (Burkhead, Robinson).

115.     Upon searching the truck, the officers located two small, round, blue pills marked with M and 30, one on the driver's seat and one on the central console.  See Tr. at 52:6-12 (Robinson).

116.     The officers field tested the pills, which tested presumptively positive for fentanyl.  See Tr. at 52:21-24 (Burkhead, Robinson).

117.     The officers located packaging bags in the vehicle.   See Tr. at 52:13-14 (Robinson).

118.     One of the packaging bags was "quite large in size" and contained a white crystalline substance inside.  Tr. at 52:14-18 (Robinson).

119.     The large bag was of the type that is "useful for containing a large amount of narcotics when you're distributing them."  Tr. at 53:9-14 (Burkhead, Robinson).

120.     The officers field tested the white crystalline substance, which tested presumptively positive for methamphetamine.  See Tr. at 52:18-20 (Robinson).

121.     There were also smaller bags in the truck.  See Tr. at 53:14 (Robinson).

122.     The smaller bags are indicative of distribution of smaller amounts of narcotics. See Tr. at 53:14-16 (Robinson).

123.     Chavez used the bags for the purpose of packing or storing methamphetamine.[11]

124.     The bags constitute drug paraphernalia.[12]

125.     As a result of the search warrant's execution, the officers charged both Chavez and Williams with State crimes.  See Tr. at 72:7-15 (Burkhead, Robinson).

---

[11]The Court reaches this conclusion upon consideration of the relevant facts in its analysis below.

[12]The Court reaches this conclusion in its analysis below after applying the relevant facts to the applicable law.

126.    After the officers executed the search warrant on December 16, 2022, they notified Villalobos of the new State charges.  See Tr. at 84:25-85:5 (Gallegos, Villalobos).

127.    Because of Chavez new charges on State crimes, Villalobos filed a petition in federal court seeking an arrest warrant.  See Tr. at 82:10-16 (Burkhead, Villalobos).

## PROCEDURAL BACKGROUND

On December 18, 2022, the Honorable Kirtan K. Khalsa, United States Magistrate Judge for the United States District Court for the District of New Mexico, issued an emergency Warrant for Arrest, filed December 18, 2022 (Doc. 49)(ex parte)("Arrest Warrant"), on the basis that Chavez had committed a supervised release violation for the conduct described above.  See Arrest Warrant at 1; Findings of Fact, supra, at 2.  Specifically, the violation is based on Chavez' arrest

on new charges of:

1)    Trafficking Controlled Substances (by possession with intent to distribute 2nd offense, methamphetamines)

2)    Trafficking Controlled Substances (by possession with intent to distribute 1st offense, psychedelic mushrooms)

3)    Aggravated fleeing a law enforcement officer

4)    Possession of drug paraphernalia

Arrest Warrant at 1.

The USPO filed the Petition before the Court on December 20, 2022.  See Petition at 1. In the Petition, the USPO explains that: (i) trafficking a controlled substance (by possession with intent to distribute 2nd offense, methamphetamines) is a violation of N.M.S.A. § 30-31-20(A)(3) and (B)(2), and that it is a first-degree felony; (ii) trafficking a controlled substance (by possession with intent to distribute 1st offense, psychedelic mushrooms) is a violation of

N.M.S.A. § 30-31-20(A)(3) and (B)(1), and is a second-degree felony; (iii) aggravated fleeing a law enforcement officer is a violation of N.M.S.A. § 29-20-1, and is a fourth-degree felony; and (iv) possession of drug paraphernalia is a violation of N.M.S.A. § 30-31-25.1(A), and is a misdemeanor.  See Petition at 1.  Accordingly, the USPO asserts in the Petition that Chavez violated the mandatory supervised release condition that he not commit another federal, state, or local crime.  See Petition at 1.  Additionally, based on Chavez' alleged possession of various controlled substances, the USPO asserts in the Petition that Chavez violated the mandatory supervised release condition that he not unlawfully possess a controlled substance.  See Petition at 2.  Accordingly, the Petition establishes a revocation range of imprisonment of 30 to 37 months based on Chavez' criminal history category of V and the Grade A violation, but notes that the maximum statutory penalty is 24 months of imprisonment and 36 months of supervised release, because Chavez' underlying offense is a Class C felony.  See Petition at 2; Violation Report at 2 (citing 18 U.S.C. § 3585(e)(3)); 18 U.S.C. §§ 3583(b)(2), (e)(3).  The Violation Report, which the USPO filed on December 20, 2022, similarly describes Chavez' time on supervised release, the facts surrounding the chase and the subsequent search, and the charges for which Chavez was arrested, and reaches the same maximum revocation range of 24 months.  See Violation Report at 1-2.

The Court held a hearing on March 14, 2023.  See Clerk's Minutes at 1.  At the hearing, Chavez indicated his intent to deny that he violated the two mandatory supervised release conditions, namely that he committed another federal, State, or local crime, and that he unlawfully possessed a controlled substance.  See Tr. at 2:8-9 (Court); id. at 3:22-24 (Court); id. at 5:18-22 (Court, Gallegos); Clerk's Minutes at 1.  After the United States presented its witness testimony, the Court heard the parties' arguments.  See Tr. at 89:24-25 (Court).

The United States began with a discussion of the State laws which it alleges Chavez violated, and provided the Court with copies of N.M.S.A. § 30-31-20, the trafficking-a-controlled-substance statute, N.M.S.A. § 30-22-1.1, the aggravated-fleeing-of-law-enforcement statute, and N.M.S.A. § 30-31-25.1, the drug-paraphernalia statute. See Tr. at 90:9-91:5 (Burkhead). Beginning with the aggravated-fleeing charge, the United States noted that the charge involves four elements: (i) that Chavez willfully and carelessly; (ii) drove a vehicle in a manner that endangered the life of another person; (iii) after giving a visual or audible signal to stop; (iv) by a uniformed law enforcement officer. See Tr. at 91:10-19 (Burkhead). The United States asserted that Fillmore and Robinson's pursuit of Chavez satisfies all of those elements. See Tr. at 91:20-25 (Burkhead).

The United States anticipated that Chavez would raise the argument that Fillmore did not have reasonable suspicion to pull over the black truck before he initiated the felony stop and responded that the officers had a search warrant for Chavez' home based on evidence that individuals were conducting drug deals out of his house, information which gave Fillmore reasonable suspicion to pull over Chavez' vehicle. See Tr. at 92:9-21 (Burkhead). The United States noted that Chavez led the police on a nearly forty-minute chase around Belen, exceeding speeds of one-hundred miles per hour, running red lights, crossing medians, and almost colliding with a law enforcement vehicle, thereby driving recklessly and endangering other peoples' lives. See Tr. at 92:22-93:16 (Burkhead). The United States also noted that Fillmore is a certified law enforcement officer and was in full uniform when he initiated the stop of Chavez' vehicle, and that Robinson was also in full uniform when he joined the pursuit. See Tr. at 93:17-24 (Burkhead). Accordingly, the United States concludes that Chavez' conduct satisfies the elements of aggravated fleeing. See Tr. at 93:25-94:2 (Burkhead).

The United States next turned to the two trafficking offenses in the Petition.  See Tr. at 94:3-4 (Burkhead).  The United States conceded that one of the trafficking charges -- the one relating to methamphetamine -- is stronger than the other --- the one relating to psilocybin mushrooms.  See Tr. at 94:7-13 (Burkhead).  The United States noted that Robinson found methamphetamine in the bedroom which Chavez occupied, as Chavez' personal identification and work clothes with his name on them indicated, and as Villalobos confirmed based on her home visits.  See Tr. 94:13-22 (Burkhead).  The United States reiterated that the methamphetamine was in a bundle inside of a suit and asserted that, although Robinson's memory was imprecise on the bundle's specific weight, it weighed more than one pound, and that, for a revocation hearing's purposes, the United States requires less specificity than it would at trial.  See Tr. at 95:1-10 (Burkhead).  At the Court's prompting, the United States confirmed that the State statute does not contain a threshold drug quantity to be considered trafficking, but that a defendant merely needs to possess the drug with the intent to distribute it.  See Tr. at 95:13-19 (Court, Burkhead).  The United States asserted that, in any event, just over a pound of methamphetamine is not consistent with personal use and instead is indicative of intent to distribute.  See Tr. at 95:20-25 (Burkhead).  The United States also conceded that final laboratory test results had not returned to determine conclusively what the substances were, but that Robinson conducted presumptively positive field tests on the scene and that those presumptive results are sufficient to meet the lower burden of proof required at revocation hearings.  See Tr. at 96:1-11 (Burkhead).

The United States turned to the psilocybin mushrooms.  See Tr. at 96:13-15 (Burkhead). The United States conceded that it could not provide a weight for the mushrooms, but reiterated that Robinson described the package as "the most he's ever seen" and that it was a distribution

amount.  Tr. at 96:15-19 (Burkhead).  The United States also conceded that Robinson did not conduct a field test and that there are therefore no presumptive test results regarding what the mushrooms were.  See Tr. at 97:6-9 (Burkhead).

The United States then discussed the drug paraphernalia charge.  See Tr. at 97:10-13 (Burkhead).  The United States asserted that the statute is wordy, but summarized it as meaning that "you can't possess items -- paraphernalia . . . -- if what you're possessing is used to store, contain , conceal, or repack, among many other things, a controlled substance."  Tr. at 97:13-18 (Burkhead).  The United States asserted that, in addition to items that store or conceal controlled substances, paraphernalia can also include objects that allow a person to inject, inhale, or otherwise introduce a controlled substance into the human body.  See Tr. at 97:19-25 (Burkhead).  The United States noted that the officers found a bag, which the United States described as a "Ziploc-type of bag," and which had methamphetamine residue inside of it, in the cab of Chavez' truck.  Tr. at 98:2-15 (Court, Burkhead).  The United States noted that the officers found in Chavez' bedroom syringes with heroin residue, unused syringes, and pipes, which the United states asserted could be used to smoke methamphetamine and fentanyl.  See Tr. at 98:17-100:21 (Court, Burkhead).

The United States turned finally to the second violation for possessing controlled substances.  See Tr. at 100:22-23 (Burkhead).  In addition to the drugs which the United States discussed in connection with Chavez' first alleged violation, the United States noted that the officers found fentanyl both in the bedroom and in the truck's cab.  See Tr. at 100:23-101:4 (Burkhead).  Because both sets of pills tested presumptively positive for fentanyl, the United States argues that their presence supports the second violation.  See Tr. at 101:4-6 (Burkhead).

Chavez argued first in response to the aggravated fleeing violation, mentioning briefly the argument that the officers had no reasonable suspicion to stop Chavez' truck.  See Tr. at 101:17-19 (Gallegos).  After a discussion with the Court, Chavez conceded that, even if the stop had been unlawful, Chavez would not have had the right to take off and lead a chase.  See Tr. at 101:21-102:4 (Court, Gallegos).   Chavez asserted that his main argument that he had not committed aggravated fleeing was that he was under duress.  See Tr. at 102:8 (Gallegos). Specifically, he argued that, because Fillmore stopped Chavez without Chavez having violated any traffic rules, Chavez did not understand the stop's purpose, but pulled over anyway.  See Tr. at 102:8-14 (Gallegos).  Chavez contended that he became alarmed at the stop, because Fillmore conducted a felony stop instead of a traditional stop, and pulled out his weapon and made instructions and demands.  See Tr. at 102:14-18 (Gallegos).  Chavez argued that, given "the track record of police officers . . . [which] has been bad for people like Mr. Chavez," Chavez felt under duress, and panicked.  Tr. at 103:2-10 (Court, Gallegos).  The Court and Chavez discussed whether that the officers had probable cause to obtain a search warrant meant that they had probable cause to arrest Chavez, and Chavez accepted that, although a search warrant does not replace an arrest warrant, the officers could have arrested Chavez based on probable cause alone. See Tr. at 103:11-104:9 (Court, Gallegos).   Chavez indicated that his main argument is that Chavez fled because of duress, namely "that he believed he was going to be killed on the side of the road by this officer who has pulled him over, with no apparent reason . . . .  He had no idea that they were serving a search warrant."  Tr. at 104:15-22 (Gallegos).  Chavez argued that he had a criminal history and a reputation within the Belen Police Department, and that the Belen Police Department targeted him, pointing to a Facebook post in which "they basically humiliated him and mock him . . . and gloated on the fact that they had taken him into custody and arrested

him on this case." Tr. at 105:6-10 (Gallegos).  He argued that, after looping around Belen, he returned to his house where there were potential witnesses who could watch the officers take him into custody.  See Tr. at 105:16-23 (Gallegos).

Chavez next turned to the controlled substances and paraphernalia charges.  See Tr. at 106:22-24 (Court, Gallegos).  He notes that Villalobos did not note anything out of the ordinary in Chavez' home during her home visits, including the latest one on October 25, 2022, questioned the veracity of the complaints against 210 Arizona Street as "built completely on confidential informants" whom he could not cross-examine, and noted that multiple people lived in the home, that all of the controlled buys which supported the search warrant's issuance were from other people in the home, and that Chavez did not participate in any of the controlled buys personally.  See Tr. at 106:25-107:24 (Gallegos).  Chavez also argued that Williams shared access to Chavez' bedroom, because the officers found her purse under the bed with her identification inside.  See Tr. at 107:25-108:6 (Gallegos).  Chavez argued, therefore, that the other items are not necessarily tied to him, because there was no fingerprinting, and no way to tell whether he hid the bundles of drugs and other paraphernalia in his clothing himself.  See Tr. at 108:6-14 (Gallegos).  Chavez noted that he had been doing well on supervised release, and was aware that Villalobos would make house visits and search for contraband, and contended that it therefore would have been reckless to risk having contraband in his bedroom, "[a]nd so it makes no sense that he would have the items." Tr. at 108:21-109:11 (Gallegos).  He argued that it makes more sense instead that Williams was connected to those items, "given the fact that there are similarities between the items that were found in the purse and the items that were found in the closet." Tr. at 109:12-18 (Gallegos).

Chavez then contested whether the Court should rely on Robinson's testimony about the presumptive test results and the drugs' weights, because the results were not memorialized or photographed, and Robinson left X's instead of specific weights in some parts of his police report, making his reporting unreliable.  See Tr. at 109:19-110:6 (Gallegos).  Chavez agreed with the United States that the distribution statutes do not include a weight threshold, but argued that "the weight goes a long way towards making that inference towards an intent to distribute, versus simple possession of an item."  Tr. at 110:7-14 (Gallegos).  He argued that, although revocation hearings require a lower standard of proof, because Chavez faces up to two years in prison, the Court should not rely on presumptive testing and reported weights without further corroborations.  See Tr. at 110:21-111:14 (Gallegos).  He also noted that the officers found most of the syringes in the purse, and that there are no photographs of what the pipes or syringes looked like.  See Tr. at 111:15-21 (Gallegos).  Accordingly, Chavez argued that the evidence is insufficient to establish that he possessed any of the items which Robinson found in his bedroom, and that they are what the United States alleges them to be.  See Tr. at 112:8-14 (Gallegos).

Regarding the car, Chavez argued that there was no reason to search the car, conduct a tow, or conduct a tow inventory, and that towing the car was not necessarily the Belen Police Department's standard practice.  See Tr. at 112:15-21 (Gallegos).  He contended that the only crime in which the truck was involved was Chavez' flight, and that it had no evidentiary value other than being the car that Chavez used to flee the officers.  See Tr. at 112:22-113:2 (Gallegos).  Accordingly, he argued that there was no constitutional basis to search the vehicle and that, in any event, the officers did not find the contraband until they conducted a formal search later.  See Tr. at 113:10-15 (Gallegos).  Chavez again noted that there were no test results of the contraband from the truck in evidence, and asserted that, although the officers assert that

they found fentanyl in the truck, they did not charge him with possession of fentanyl, and only with possession of meth and psilocybin mushrooms.  See Tr. at 113:16-22 (Gallegos).  Chavez contended, therefore, that the alleged presence of fentanyl in the car is irrelevant.  See Tr. at 113:23-114:3 (Gallegos).  Regarding the money which the officers found on Chavez when he was arrested, Chavez notes that Robinson could not remember the specific amounts, and that Chavez was involved in buying and selling vehicles, which would explain the amount of money that he was carrying, undercutting any connection to the drugs.  See Tr. at 115:4-13 (Gallegos).

The United States first responded to Chavez' argument regarding the duress defense.  See Tr. at 116:11 (Burkhead).  The United States referenced the United States Court of Appeals for the Tenth Circuit's uniform jury instructions on duress and noted that it is a high standard, requiring "that the defendant was under . . . an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to himself or a family member or others."  Tr. at 116:12-117:1 (Burkhead)(referencing Criminal Pattern Jury Instruction Committee of the United States Circuit Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions 1.36 at 57 (2021 ed.)(Coercion or Duress)).  The United States asserted that it would not minimize the problems facing law enforcement in the United States, but that traffic stops like the one which Fillmore initiated happen every day, but that the vast majority of them do not result in death or serious bodily injury, and that the traffic stop here could not have given Chavez a well-grounded apprehension of death or serious bodily injury.  See Tr. at 117:2-118:2 (Burkhead).  The United States noted that Chavez also would have to show that he had no legal alternative to violating the law, but that here, he could have submitted to law enforcement, and did not have to flee.  See Tr. at 118:3-13 (Burkhead).

Regarding the trafficking-controlled-substances violations, the United States agreed that Chavez did not have the contraband actually in his possession, but that he, like many other defendants, constructively possessed the contraband.  See Tr. at 119:2-9 (Burkhead).  The United States contended that most defendants do not carry one pound of methamphetamine on their persons, but instead hide the pound of methamphetamine somewhere that will be difficult to find, like inside of a suit in a bedroom closet, as was the case here.  See Tr. at 119:10-23 (Burkhead). The United States conceded that there were no photographs of the tests or of the evidence in place, but contended that this lack is not the same as having no evidence, because the United States presented officers to testify as to what they had seen.  See Tr. at 119:24-120:7 (Burkhead). The United States argued that, in a revocation hearing with a lower standard of proof, testimony can be sufficient to establish violations, even though the United States would rely on stronger evidence to meet the higher burden of proof in the trial context.  See Tr. at 120:8-15 (Burkhead).

Finally, the United States rebutted Chavez' argument that the officers did not have a reason to search his truck by noting that the officer obtained a search warrant to search the truck. See Tr. at 120:16-20 (Burkhead).  Chavez replied that the officers did not secure the search warrant for the truck until three days after the incident, on December 19, 2022.  See Tr. at 121:22-122:1 (Gallegos).  Accordingly, Chavez argued that the officers searched the truck without a warrant initially and that the officers found the contraband during this time.  See Tr. at 122:2-6 (Gallegos).  Chavez reiterated his argument that the alleged fentanyl found in the truck is irrelevant, because Chavez was not charged with fentanyl possession, and that, to the extent that bags with drug residue were inside the truck, the lack of photographic evidence makes it impossible to know whether those bags were consistent with drug paraphernalia.  See Tr. at 122:9-20 (Gallegos).  Regarding his duress argument, Chavez argued that, even if most stops do

not result in death or serious bodily injury, this stop's circumstances make it a unique case in which Chavez was right to fear for his life, because of the stop's location, Chavez' relationship with the Belen Police Department, the time of day, that the stop was unprompted, and that the stop was a felony stop in which Fillmore had his weapon drawn and was shouting orders.  See Tr. at 123:5-24 (Gallegos).

The United States responded that the truck's search was appropriate, but offered additional briefing on that point.  See Tr. at 124:3-11 (Burkhead).  The United States contended that, to the extent that the search's constitutionality was at issue, the Carroll doctrine[13] applies, and that the officers had the right to search Chavez' vehicle after arresting him subsequent to the high-speed chase.  See Tr. at 124:12-17 (Burkhead).  The United States conceded that the officers obtained the warrant three days after seizing the vehicle the morning of the incident, but argued that, even if the Carroll doctrine does not apply, the inevitable-discovery doctrine applies, because the officers obtained a valid warrant to search the truck.  See Tr. at 124:18-125:9 (Burkhead).

The Court indicated that it was inclined to find that Chavez violated the aggravated-fleeing-of-a-law-enforcement-officer statute, because the statute's violation does not require that the initial stop have been proper or pursuant to probable cause.  See Tr. at 125:12-20 (Court). The Court then indicated that it needed to think more about the other charges, but that it was inclined to think at least that the methamphetamine in Chavez' suit satisfies the trafficking violation.  See Tr. at 125:21-126:3 (Court).  The Court and the parties initially were prepared to proceed to sentencing based on the Court's conclusion that Chavez had violated the aggravated-

---

[13]The Carroll doctrine takes its name from Carroll v. United States, 267 U.S. 132 (1925)("Carroll"), in which the Supreme Court of the United States of America upheld warrantless automobile searches that occurred incident to lawful arrests.

fleeing statute, but stopped when Villalobos indicated that Chavez' violation would drop to a grade B violation and that his revocation range would change accordingly.  See Tr. at 126:10-128:16 (Court, Gallegos, Villalobos).   Accordingly, the Court concluded that it could not proceed to sentencing at the hearing and would have to consider all of the alleged violations.  See Tr. at 128:17-20 (Court).   The Court confirmed that, at minimum, Chavez' revocation range would be 18 to 24 months based on a grade B violation and invited the parties to submit additional briefing on the issues, and to submit the search warrant and any additional evidence while the Court considered the issues.  See Tr. at 129:1-130:4 (Court, Burkhead, Gallegos, Villalobos).

### LAW REGARDING SUPERVISED RELEASE REVOCATION AND REVOCATION HEARINGS

Subsection (e)(3) of § 3583 of Title 18 of the United States Code permits courts to revoke supervised release after concluding that the defendant violated a condition of probation by a preponderance of the evidence.  See 18 U.S.C. § 3583(e).   Section 3583(e)(3) sets forth the process for revoking supervised release:

> (e)    **Modification of conditions or revocation**. -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --
>
> . . . .
>
> > (3)    revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation

> more than 5 years in prison if the offense that resulted in the term
> of supervised release is a class A felony, more than 3 years in
> prison if such offense is a class B felony, more than 2 years in
> prison if such offense is a class C or D felony, or more than one
> year in any other case . . . .

18 U.S.C. § 3583(e) (bold in original).  "Preponderance of the evidence" means:

> The greater weight of the evidence, not necessarily established by the greater
> number of witnesses testifying to a fact but by evidence that has the most
> convincing force; superior evidentiary weight that, though not sufficient to free
> the mind wholly from all reasonable doubt, is still sufficient to incline a fair and
> impartial mind to one side of the issue rather than the other.

"Preponderance of the Evidence," Black's Law Dictionary (11th ed. 2019).  See 10th Cir. Pattern

Jury Instruction 1.05.1 ("Preponderance of evidence is evidence sufficient to persuade you that a

fact is more likely present than not present").

     "The Sixth Amendment [to the Constitution of the United States of America] is a trial

right" and does not apply to revocation hearings.  United States v. Hernandez, 778 F. Supp. 2d

1211, 1225 (D.N.M. 2011)(Browning, J.).  Rule 32.1 of the Federal Rules of Criminal Procedure,

however, gives the defendant at the revocation hearing "an opportunity to appear, present

evidence, and question any adverse witness unless the court determines that the interest of justice

does not require the witness to appear."  Fed. R. Crim. P. 32.1(b)(2)(c).  The rule's notes instruct

courts to apply a balancing test that weighs "the person's interest in the constitutionally

guaranteed right to confrontation against the government's good cause for denying it."  Rule 32.1

Advisory Committee's Note to the 2012 Amendment.  The Tenth Circuit has adopted this

balancing test "when determining a releasee's confrontation rights at a revocation hearing."

Jones, 818 F.3d at 1099.  See United States v. Hernandez, 428 F. Supp. 3d at 788 ("When

applying the balancing test, the Court must weigh the defendant's interest in cross-examining

and confronting [a] witness with the government's good cause for not presenting the witness"
(citing Jones, 818 F.3d at 1098)).

Although 18 U.S.C. § 3583(e) establishes the maximum terms of imprisonment upon the
revocation of a defendant's supervised release, the United States Sentencing Guidelines
("U.S.S.G." or the "Guidelines") establish revocation imprisonment ranges based on the
defendant's criminal history category and the violation grade.  See U.S.S.G. § 7B1.4(a).  The
Guidelines establish three violation categories:

> (1)     GRADE A VIOLATIONS -- conduct constituting (A) a federal, state, or
> local offense punishable by a term of imprisonment exceeding one year
> that (i) is a crime of violence, (ii) is a controlled substance offense, or
> (iii) involves possession of a firearm or destructive device of a type
> described in 26 U.S.C. § 5845(a); or (B) any other federal, state, or local
> offense punishable by a term of imprisonment exceeding twenty years;
>
> (2)     GRADE B VIOLATIONS -- conduct constituting any other federal, state,
> or local offense punishable by a term of imprisonment exceeding one year;
>
> (3)     GRADE C VIOLATIONS -- conduct constituting (A) a federal, state, or
> local offense punishable by a term of imprisonment of one year or less; or
> (B) a violation of any other condition of supervision.

U.S.S.G. § 7B1.2(a) (capitalization in original).   In determining the applicable revocation
imprisonment range, the Guidelines instruct that courts should apply the criminal history
category applicable at the time of the defendant's underlying sentencing.  See U.S.S.G. § 7B1.4
cmt. n.1.

## ANALYSIS

The United States has alleged two violations of Chavez' supervised release conditions:
(i) that he committed another federal, State, or local crime; and (ii) that he unlawfully possessed
a controlled substance.  See Petition at 1-2.  The Court considers each in turn.  Because the Court
concludes that the United States has shown by a preponderance of the evidence that Chavez

committed violations of aggravated fleeing a law enforcement officer, possession with intent to distribute methamphetamine, and use of drug paraphernalia, the Court concludes that Chavez committed a State crime.  Additionally, the Court concludes that the United States has shown by a preponderance of the evidence that Chavez unlawfully possessed a controlled substance.

## I.    THE COURT CONCLUDES THAT CHAVEZ VIOLATED HIS SUPERVISED RELEASE CONDITION THAT HE NOT COMMIT ANOTHER FEDERAL, <u>STATE, OR LOCAL CRIME</u>.

The first violation which the United States alleges is that Chavez committed another federal, State, or local crime.  <u>See</u> Petition at 1.  It predicates this allegation on Chavez' arrest on four State crimes: (i) trafficking a controlled substance (by possession with intent to distribute 2nd offense, methamphetamines), a violation of N.M.S.A. § 30-31-20(A)(3) and (B)(2); (ii) trafficking a controlled substance (by possession with intent to distribute 1st offense, psychedelic mushrooms), a violation of N.M.S.A. § 30-31-20(A)(3) and (B)(1); (iii) aggravated fleeing a law enforcement officer, a violation of N.M.S.A. § 30-22-1.1[14]; and (iv) possession of drug paraphernalia, a violation of N.M.S.A. § 30-31-25.1(A).  <u>See</u> Petition at 1.  The Court addresses each of these alleged crimes to determine whether the United States has shown by a preponderance of the evidence that Chavez committed each crime.

---

[14]The Petition alleges that Chavez engaged in the aggravated fleeing of a law enforcement officer "[i]n violation of the Law Enforcement Safe Pursuit Act (29-20-1 NMSA 1978)."  Petition at 1.  Section 29-20-1 is the correct citation to the Law Enforcement Safe Pursuit Act; however, N.M.S.A. § 30-22-1.1 establishes the substantive aggravated-fleeing-a-law-enforcement-officer offense.  <u>See</u> N.M.S.A. § 30-22-1.1.  As the Court discusses in this section, the New Mexico Criminal Uniform Jury Instructions establish the elements required to establish this crime.  <u>See</u> N.M.R.A. Crim. UJI 14-2217.

### A.   THE COURT CONCLUDES THAT CHAVEZ COMMITTED AGGRAVATED FLEEING OF A LAW ENFORCEMENT OFFICER.

The Court first considers whether Chavez committed the crime of aggravated fleeing from a law enforcement officer under § 30-22-1.1.  Section 30-22-1.1 establishes:

A.   Aggravated fleeing a law enforcement officer consists of a person willfully and carelessly driving a vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an authorized emergency vehicle pursuant to Section 66-7-6 NMSA 1978 in pursuit in accordance with the provisions of the Law Enforcement Safe Pursuit Act.

B.   Whoever commits aggravated fleeing a law enforcement officer that does not result in injury or great bodily harm to another person is guilty of a fourth degree felony.

C.   Whoever commits aggravated fleeing a law enforcement officer that results in injury to another person is guilty of a third degree felony.

N.M.S.A. § 30-22-1.1.   In essence, this statute establishes four elements: (i) a person who willfully and carelessly drives a vehicle; (ii) in a manner that endangers the life of another person; (iii) after being given a visual or audible signal to stop, including by voice, lights, or sirens; and (iv) by a uniformed law enforcement officer in an authorized emergency vehicle.[15]
N.M.S.A. § 30-22-1.1.   The New Mexico Criminal Uniform Jury Instructions corroborate these elements:

For you to find the defendant guilty of aggravated fleeing a law enforcement officer . . . , the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1.   The defendant operated a motor vehicle;

---

[15]Although the statute also includes language indicating that the pursuit should be "in accordance with the provisions of the Law Enforcement Safe Pursuit Act," N.M.S.A § 30-22-1.1, the Supreme Court of New Mexico has explained that that language "is not an essential element of the crime of aggravated fleeing," State v. Padilla, 2008-NMSC-006, ¶ 34, 143 N.M. 310, 318; 176 P.3d 299, 307.

2.      The defendant drove willfully and carelessly in a manner that endangered or could have endangered to life of another person;

3.      The defendant had been given a visual or audible signal to stop by a uniformed law enforcement officer in an appropriately marked law enforcement vehicle;

4.      The defendant knew that a law enforcement officer had given the defendant an audible or visual signal to stop

N.M.R.A. Crim. UJI 14-2217.[16]

The Court concludes that the United States has shown by a preponderance of the evidence that Chavez' flight from Fillmore satisfies each of the four elements.  First, Chavez' driving of the truck during the pursuit was willful and careless.  That Chavez was driving the truck is not in dispute.  As Chavez fled north on Highway 314, he was driving "'extremely fast and recklessly,'" approximately seventy-five miles per hour in a fifty-five mile per hour zone. Findings of Fact, supra ¶ 47, at 7 (quoting Tr. at 16:16-22 (Burkhead, Fillmore)).  Chavez' speed as he returned to Belen was between eighty to one-hundred miles per hour.  See Findings of Fact,

---

[16]Although New Mexico's Uniform Jury Instructions can be challenged as incorrect statements of law, "'[t]he Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.'"  Grasshopper Natural Medicine, LLC v. Hartford Casualty Ins. Co., No. CIV 15-0338 JB/CEG, 2016 WL 4009834, at *31 n.18 (D.N.M. July 7, 2016) (Browning, J.)(quoting Back v. ConocoPhillps Co., No. CIV 12–0261 JB/WDS, 2012 WL 6846397, at *15 n.2 (D.N.M. August 31, 2012)(Browning, J.)(citing State v. Wilson, 1994-NMSC-009, ¶ 5, 116 N.M. 793, 867 P.2d 1175, 1178)).   With respect to Uniform Jury Instructions committee commentary, the Supreme Court of New Mexico has explained:

In any event, the committee comment is not the law of New Mexico, see O'Hare v. Valley Utils., Inc., [1994-NMSC-008, ¶ 6,] 89 N.M. 105, 112, 547 P.2d 1147, 1154 . . . (stating that committee comments are not equivalent to the directions for use), rev'd on other grounds, 89 N.M. 262, 550 P.2d 274 (1976), and comments must stand on their own merit without implied endorsement of this Court.

Cress v. Scott, 1994-NMSC-008, ¶ 6, 117 N.M. 3, 868 P.2d 648, 650-51.

supra ¶ 53, at 8 (citing Tr. at 20:4-6 (Fillmore)).   As Chavez approached where officers had set up stop sticks, he jumped over the highway's dirt median to avoid the intersection and got onto the East Frontage Road travelling south.  See Findings of Fact, supra ¶ 57, at 8 (citing Tr. at 20:20-21:1 (Fillmore); id. at 21:13-14 (Fillmore)).   Shortly thereafter, Chavez got onto I-25 southbound, where he exceeded speeds of 115 miles per hour.  See Findings of Fact, supra ¶ 64, at 11 (citing Tr. at 23:21-23 (Fillmore); id. at 43:7-18 (Burkhead, Robinson)).   As he returned to Belen on I-25 northbound, he exceeded speeds of one-hundred miles per hour.  See Findings of Fact, supra ¶ 64, at 11 (citing Tr. at 24:22 (Fillmore)).   Once back in Belen, Chavez ran a red light at the intersection of Camino del Llano and South Main Street.  See Findings of Fact, supra ¶ 70, at 11 (citing Tr. at 25:7-10 (Fillmore)).   Fillmore initiated his stop at 6:57 a.m., see Findings of Fact, supra ¶ 36, at 6 (citing Tr. at 17:10-11  (Fillmore)), and morning traffic continued to grow as the morning progressed, see Findings of Fact, supra ¶ 48, at 7 (citing Tr. at 17:12-13 (Fillmore)); Findings of Fact, supra ¶ 71, at 11 (citing Tr. at 25:19-26:2 (Burkhead, Fillmore)).   All of these acts indicate that Chavez was driving his truck willfully and carelessly.  See Findings of Fact, supra ¶ 77, at 12; N.M.S.A. § 30-22-1.1(A).

Second, Chavez drove his truck in a manner that endangered the lives of others.  As the Court describes above, Chavez drove at sustained, dangerous speeds.  See, e.g., Findings of Fact, supra ¶ 64, at 11 (citing Tr. at 23:21-23 (Fillmore); id. at 43:7-18 (Burkhead, Robinson)).  Additionally, Chavez ran a red light at an intersection at which Fillmore had to slam on his brakes to avoid colliding with the morning traffic.  See Findings of Fact, supra ¶ 70, at 11 (citing Tr. at 25:7-10 (Fillmore)); Findings of Fact, supra ¶ 71, at 11 (citing Tr. at 25:19-26:2 (Burkhead, Fillmore)).  Finally, after Chavez jumped the dirt median on the way south back into Belen, Chavez almost collided with Fillmore's day shift supervisor, Solinger, who was in his

vehicle.  See Findings of Fact, supra ¶ 58, at 9 (citing Tr. at 21:1-2 (Fillmore); id. at 22:7-11 (Burkhead, Fillmore)).   Accordingly, not only did Chavez' careless driving endanger other drivers on the road generally, he almost collided with Solinger, endangering Solinger's life specifically.  See N.M.S.A. § 30-22-1.1(A).

The third and fourth factors are also satisfied here.  Fillmore's lights and sirens were on throughout his pursuit of Chavez, see Findings of Fact, supra ¶ 74, at 12 (citing Tr. at 18:14-15 (Fillmore)), and, when Fillmore initiated the stop, Chavez did not stop the truck right away, but eventually came to a stop, see Findings of Fact, supra ¶¶ 36-37, at 6 (citing Tr. at 13:3 (Fillmore); id. at 13:25-14:10 (Burkhead, Fillmore); id. at 17:10-11 (Fillmore)), indicating that Chavez was aware that Fillmore had given him a signal to stop, see Findings of Fact, supra ¶ 38, at 7.   Additionally, Fillmore was in a marked police vehicle and in his duty uniform.   See Findings of Fact, supra ¶ 22, at 5 (citing Tr. at 10:7-9 (Fillmore)).   Accordingly, the Court concludes that Fillmore gave Chavez a visual or audible signal to stop, and that Fillmore was a uniformed law enforcement officer in an authorized emergency vehicle.   See N.M.S.A. § 30-22-1.1(A).   In total, therefore, the Court concludes that Chavez violated § 30-22-1.1(A) for aggravated fleeing of a law enforcement officer.   See Findings of Fact, supra ¶ 79, at 12.

Chavez does not dispute specifically that he engaged in conduct that constitutes aggravated fleeing; rather, he argues that he fled, because he was under duress as a result of Fillmore's conducting a felony stop, causing him to panic.   See Tr. at 104:11-106:21 (Court, Gallegos).   The Court concludes that duress is not an applicable defense in this context.   See Findings of Fact, supra ¶ 85, at 13.   First, the Court notes that, when a defendant asserts duress, he or she "admits performing the crime but seeks excusal from punishment on grounds that the action was compelled by an imminent threat of serious hard to the accused or another."   State v.

Ortiz, 2020-NMSC-008, ¶ 12, 468 P.3d 833, 835 (citing N.M.R.A. 14-5130; Esquibel v. State, 1978-NMSC-024, ¶ 9, 91 N.M. 498, 576 P.2d 1129, overruled on other grounds by State v. Wilson, 1994-NMSC-009, ¶ 6, 116 N.M. 793, 867 P.2d 1175; State v. Rios, 1999-NMCA-069, ¶¶ 12, 17, 127 N.M. 334, 980 P.2d 1068).  A defendant who asserts duress "must make 'a prima facie showing that he was in fear of immediate and great bodily harm to himself or another and that a reasonable person in his position would have acted the same way under the circumstances.'"  State v. Ortiz, 2020-NMSC-008, ¶ 12, 468 P.3d at 835 (quoting State v. Castrillo, 1991-NMSC-096, ¶ 4, 112 N.M. 766, 819 P.2d 1324).  "A court should not focus on the immediacy of the threat in a vacuum; in evaluating a potential defense of duress, a threat of immediate bodily harm must be considered in the context of the reasonableness of the response to that harm."  State v. Castrillo, 1991-NMSC-096, ¶ 15, 112 N.M. at 772, 819 P.2d at 1330. There must also exist a nexus between the threatened harm and the defendant's response.  See State v. Castrillo, 1991-NMSC-096, ¶ 16, 112 N.M. at 772, 819 P.2d at 1330 ("[T]he defense of duress is available against the charge of felon in possession only when no reasonable alternatives are available -- a reasonable felon would resort to possession of a firearm only when committing the offense is the only reasonable alternative.").

The Court concludes first that Chavez has not made a showing that he feared immediate and great bodily harm.  First, the only evidence elicited about Chavez' reaction to the stop is that he shouted "What for?" -- which indicates that he was defiant and challenging the basis for the stop, rather than in fear of immediate and great bodily harm, see Findings of Fact, supra ¶ 43, at 7 -- and that he fled the stop, Findings of Fact, supra ¶¶ 42-44, at 7 (quoting Tr. at 15:17

(Fillmore) and citing id. at 15:23-16:2 (Burkhead, Fillmore)).[17]   Additionally, the Court acknowledges the United States' argument that, although some traffic stops result in serious injury or death, the vast majority of traffic stops do not result in serious injury or death.  See Tr. at 117:2-118:2 (Burkhead).   Police officers pull over more than twenty-million drivers every year, see Findings of Fact, supra ¶ 80, at 12 (citing Findings, Stanford Open Policing Project), but killings at traffic stops occur at a rate of approximately 1,000 deaths per year, see Findings of Fact, supra ¶ 81, at 13 (citing Kirkpatrick, Eder & Barker, Cities Try to Turn the Tide on Police Traffic Stops).   Even acknowledging that felony traffic stops are not the usual method for stopping a vehicle, see Findings of Fact, supra ¶ 41, at 7 (citing Tr. at 30:17-20 (Fillmore)), that the vast majority of police traffic stops do not result in death, coupled with the lack of evidence indicating that Chavez feared immediate and great bodily harm, leads the Court to conclude that Chavez has not made a showing that he feared immediate and great bodily harm, see Findings of Fact, supra ¶ 83, at 13.

The Court also concludes that Chavez has not made a showing that a reasonable person would have acted the same way under the circumstances or that no reasonable alternatives were available but to flee.  The Court notes again that police officers initiate approximately twenty-million traffic stops per year, but in 2012, for example, State and local law enforcement agencies

---

[17]Although Chavez's counsel asserted in argument before the Court that Chavez had a reputation within the Belen Police Department and that Chavez therefore reasonably feared for his life, see Tr. at 105:6-10 (Gallegos), he did not elicit testimony or provide evidence to support this assertion, other than to demonstrate that Robinson was aware of a Facebook post made after Chavez' arrest announcing the drug bust, and to demonstrate that Robinson was not aware of an alleged conversation by a group of officers about wanting to kill Chavez following one of his State court hearings, both of which allegedly occurred after Chavez' arrest, see Tr. at 69:4-71:16 (Court, Burkhead, Gallegos, Robinson).  Because the posting and conversation took place after Chavez' arrest, the Court concludes that they are not probative and do not amount to a preponderance of the evidence that Chavez feared immediate and great bodily harm.

conducted an estimated 68,000 vehicle pursuits.  See Findings of Fact, supra ¶ 82, at 13 (citing

Reaves, Special Report: Police Vehicle Pursuits, 2012-2013).   Compared to the estimated

twenty-million annual stops, this number of annual pursuits results in an incidence rate of 0.34

percent.   Without evidence to the contrary, even if the Court were to conclude that Chavez

demonstrated fear -- which it does not -- the Court does not conclude that Chavez' response to

that fear was reasonable or that he had no other alternatives but to flee, because a reasonable

person in his position could have and would have complied with Fillmore's commands and

exited the vehicle.   Accordingly, the Court concludes that Chavez has not made a showing that

he fled the traffic stop under duress.[18]  See Findings of Fact, supra ¶ 85, at 13.

    The Court concludes therefore that the United States has shown by a preponderance of

the evidence that Chavez committed the State crime of aggravated fleeing from a law

enforcement officer.   See Findings of Fact, supra ¶ 79, at 12.   Because Chavez' flight did not

result in injury or great bodily harm, his crime constitutes a fourth-degree felony.   The basic

sentence for a fourth-degree felony in New Mexico is eighteen months imprisonment.   See

---

[18]In response to the United States' anticipation that Chavez would raise the issue whether Fillmore had reasonable suspicion to stop Chavez' truck in the first place, Chavez briefly raised the reasonable-suspicion issue, see Tr. 101:17-102:7 (Court, Gallegos), but in response to the Court's questioning, asserted that his real defense was the duress defense, see Tr. at 104:6-13 (Court, Gallegos).  To the extent that Chavez raises this issue, the Court has not identified any case law from the New Mexico State courts which suggests that flight from a stop which reasonable suspicion or probable cause does not constitute aggravated fleeing to the extent that the flight satisfies the statute's elements.  Further, § 30-22-1.1 does not indicate that the stop must be lawful for a flight to constitute aggravated fleeing, but requires only that the defendant "willfully and carelessly driv[e] a vehicle in a manner that endangers the life of another person after being given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed law enforcement officer in an authorized emergency vehicle," regardless whether the officer gives the visual or audible signal to stop based on reasonable suspicion or probable cause. N.M.S.A. § 30-22-1.1(A).

N.M.S.A. § 31-18-15(A).  Accordingly, it constitutes a Grade B violation under the Guidelines.
See U.S.S.G. § 7B1.2(a)(2).

## B. THE COURT CONCLUDES THAT CHAVEZ COMMITED A VIOLATION OF TRAFFICKING METHAMPHETAMINE.

The United States also alleges that Chavez committed another State crime by trafficking
in methamphetamine, a violation of N.M.S.A. § 30-31-20(A)(3).  See Petition at 1.  The relevant
section of § 30-31-20 provides that "'traffic' means the . . . possession with intent to
distribute . . . methamphetamine . . . ."    N.M.S.A.  § 30-31-20(A)(3)(c).    First, regarding
possession, a defendant does not have to hold physically the narcotics to be found in possession
of them; New Mexico courts allow for constructive possession to satisfy the possession
requirement "when the defendant has knowledge of the presence of the drug and control over it."
State v. Brietag, 1989-NMCA-019, ¶ 11, 108 N.M. 368, 772 P.2d 898 (citing State v. Montoya,
1980-NMSC-093, ¶ 9, 85 N.M. 126, 509 P.2d 893).[19]  As the Court of Appeals of New Mexico
notes:

---

[19]The Court concludes that, if presented with the issue whether the Supreme Court of
New Mexico would adopt the Court of Appeals of New Mexico's conclusions regarding
constructive possession in State v. Brietag, the Supreme Court of New Mexico would adopt
those conclusions, because the Supreme Court of New Mexico previously has recognized
constructive possession as a substitution for physical possession.  See State v. Barber, 2004-
NMSC-019, ¶ 22, 135 N.M. 621, 92 P.3d 633 ("When actual physical control cannot be directly
proven, constructive possession is a legal fiction used to expand possession and include those
cases 'where the inference that there has been possession at one time is exceedingly
strong.'")(quoting Charles H. Whitebread & Ronald Stevens, *Constructive Possession in
Narcotics Cases: To Have and Have Not*, 58 Va. L. Rev. 751, 755 (1972)); State v. Montoya,
1980-NMSC-093, ¶ 9, 85 N.M. 126, 509 P.2d 893; Scroggins v. State, 1990-NMSC-103, ¶ 18,
111 N.M. 122, 802 P.2d 631 (Baca, J., dissenting)("It is well established that, to establish
possession of narcotics, actual possession need not be proven -- constructive possession
suffices.")(citing United States v. Medina, 834 F.2d 874 (10th Cir. 1987); State v. Montoya,
1980-NMSC-093, ¶ 9, 85 N.M. 126, 509 P.2d 893; State v. Brietag, 1989-NMCA-019, 108 N.M.
368, 772 P.2d 898; State v. Doe, 1984-NMCA-114, 103 N.M. 178, 704 P.2d 432; N.M.R.A.
Crim. UJI 14-3130).  Accordingly, the Court relies on State v. Brietag in this opinion.

> Where a defendant is not in exclusive possession of the premises on which drugs are found, an inference of constructive possession cannot be drawn unless there are incriminating statements or circumstances tending to support the inference. *State v. Herrera*, 90 N.M. 306, 563 P.2d 100 (Ct. App. 1977); *State v. Bowers*, 87 N.M. 74, 529 P.2d 300 (Ct. App. 1974).
>
>    . . . .
>
>    Where drugs are found on premises that a defendant does not exclusively possess, the fact that they are found in close proximity to his personal belongings may be a circumstance sufficient to link him with the possession of those drugs. *Gary v. State*, 473 So. 2d 604 (Ala. Crim. App. 1985); *see generally* Annot., *Conviction of Possession of Illicit Drugs Found in Premises of Which Defendant Was in Nonexclusive Possession*, 56 A.L.R. 3d 948, § 10 (1974). The question is whether there exists a rational connection between the location of the drugs and defendant's probable knowledge and control of them. *Gary v. State*. The presence of drugs in a drawer in a defendant's bedroom, when defendant's papers were also in the drawer, supports an inference that defendant exercised control over the drawer's contents and knew the drugs were present. *People v. Richardson*, 139 Mich. App. 622, 362 N.W.2d 853 (1984).

State v. Brietag, 1989-NMCA-019, ¶¶ 12, 14, 108 N.M. at 370, 772 P.2d at 900. See N.M.R.A. Crim. UJI 14-3130 (Possession of a controlled substance; defined)("Even if the substance is not in his physical presence, he is in possession if he knows where it is, and he exercises control over it . . . . A person's presence in the vicinity of the substance or his knowledge of [its] existence or [] location . . . , is not, by itself, possession."). Regarding intent to distribute, although the statute does not specify an amount that an individual must possess to indicate an intent to distribute, evidence about the amount of drugs which an individual possessed -- i.e., whether it was an amount consistent with personal use or for distribution purposes -- can support a conclusion that an individual intended to distribute methamphetamine. See State v. Rael-Gallegos, 2013-NMCA-092, ¶ 30, 308 P.3d 1016, 1025 (noting that, in establishing a defendant's violation of the trafficking statute, "an officer may testify as an expert and offer his or her opinion as to a trafficking amount versus personal use amount of narcotics"); State v. Curry, 1988-NMCA-031,

¶ 7, 107 N.M. 133, 753 P.2d 1321 ("Intent to distribute may be inferred when the amount of a controlled substance possessed is inconsistent with personal use.")(citing State v. Donaldson, 1983-NMCA-064, ¶ 25, 100 N.M. 111, 666 P.2d 1258; State v. Quintana, 1975-NMCA-034, ¶ 15, 87 N.M. 414, 534 P.2d 1126).  But see State v. Becerra, 1991-NMCA-090, ¶ 22, 112 N.M. 604, 817 P.2d 1246 (agreeing that, "[i]n some cases, the quantity [of drugs] recovered is sufficient to support an inference of intent to distribute," but concluding that, "in this case, where there was no evidence of the concentration of the drug, and no evidence of how long it would normally take a single drug user to consume a given quantity," the substance's weight by itself could not enable a factfinder to conclude beyond a reasonable doubt that there was an intent to distribute).

Here, the Court concludes that the United States has shown by a preponderance of the evidence that Chavez was in constructive possession of the methamphetamine, because it was in close proximity to his personal belongings.  First, the bedroom in which Robinson found the approximate pound of methamphetamine was located in a padlocked bedroom, which officers knew belonged to Chavez based on their earlier investigation, see Findings of Fact ¶ 89, at 14 (citing Tr. at 45:18-46:1 (Burkhead, Robinson); id. at 60:8-13 (Gallegos, Robinson)), which Villalobos, who had conducted home visits, confirmed was Chavez' bedroom, see Findings of Fact, supra ¶ 90, at 14 (citing Tr. at 88:15-21 (Burkhead, Villalobos)), and which the officers confirmed upon finding Chavez' identifying documents, photographs, and work uniforms with his name on them, see Findings of Fact, supra ¶ 90, at 14 (citing Tr. at 46:1-5 (Robinson)). Although Villalobos indicated that Chavez advised her that no one was staying in the bedroom with him, see Tr. at 88:22-89:4 (Burkhead, Villalobos), the Court concludes that Chavez did not have exclusive control over the bedroom based on the presence of Williams' purse under the bed,

see Findings of Fact, supra ¶¶ 91-92, at 14 (citing Tr. at 46:15-16 (Robinson); id. at 62:23-63:7 (Gallegos, Robinson)).   Although Chavez did not have exclusive control over the bedroom in which Robinson found the methamphetamine, the bundle's location nevertheless supports the inference that Chavez exercised control over the bundle, because it was located rolled up inside of a freshly tailored suit jacket in a closet in which other shirts bearing Chavez' name also were hanging.   See Findings of Fact, supra ¶ 90, at 14 (citing Tr. at 46:1-5 (Robinson); id. at 49:8-10 (Robinson)); Findings of Fact, supra ¶ 102, at 15 (citing Tr. at 50:12-51:6 (Burkhead, Robinson)).   See also State v. Brietag, 1989-NMCA-019, ¶ 12, 108 N.M. 368, 772 P.2d 898 ("Where drugs are found on premises that a defendant does not exclusively possess, the fact that they are found in close proximity to his personal belongings may be a circumstance sufficient to link him with the possession of those drugs.").

The Court also concludes that the United States has shown by a preponderance of the evidence that Chavez intended to distribute the methamphetamine.   The heat- and vacuum-sealed methamphetamine bundle weighed just over one pound, an amount which is consistent with methamphetamine distribution.   See Findings of Fact, supra ¶¶ 104-105, at 15 (citing Tr. at 51:4-6 (Robinson); id. at 75:11-18 (Burkhead, Robinson)).   Although evidence solely about the drug's quantity is insufficient under New Mexico law to demonstrate intent beyond a reasonable doubt, see State v. Becerra, 1991-NMCA-090, ¶ 22, 112 N.M. at 608, 817 P.2d at 1250, the Court also looks to the facts that, when he was arrested, Chavez was carrying over $2,000.00 in cash, mostly in small bills, which is indicative of drug distribution, see Findings of Fact, supra ¶¶ 110-112, at 16 (citing Tr. at 48:1 (Robinson); id. at 48:12-13 (Robinson); id. at 48:20-23 (Robinson); id. at 49:1-3 (Robinson)), and that the officers found a large bag in Chavez' truck that contained residual methamphetamine and is useful in distributing narcotics, see Findings of Fact, supra

¶¶ 117-119, at 17 (citing Tr. at 52:13-20 (Robinson); id. at 53:9-14 (Burkhead, Robinson)), as well as smaller bags which are indicative of distribution of smaller quantities of narcotics, see Findings of Fact, supra ¶¶ 121-122, at 17 (citing Tr. at 53:14-16 (Robinson)). The Court also notes that, before the incident, the investigating officers conducted multiple controlled drug buys from Chavez' address, although Chavez was not involved personally with the sales.[20]   See Findings of Fact, supra ¶¶ 15-16, at 4 (citing Tr. at 54:10-17 (Gallegos, Robinson)). The Court notes that Chavez argues that the cash on his person could have an innocent source, namely his efforts to buy and sell vehicles, see Tr. at 115:4-13 (Gallegos), but concludes that, when looked at in its entirety, the facts show by a preponderance of the evidence, that Chavez intended to distribute the approximately one pound of methamphetamine. Accordingly, the Court concludes that the United States has shown by a preponderance of the evidence that Chavez possessed methamphetamine with the intent to distribute it.

In New Mexico, possession of methamphetamine with intent to distribute is a second degree felony for the first offense, and a first degree felony for the second and subsequent offenses. See N.M.S.A. § 30-31-20(B). Chavez is charged with a second offense. See Arrest Warrant at 1; Petition at 1. A first-degree felony carries a basic sentence of eighteen years of imprisonment, and a second-degree felony carries a basic sentence of nine years of imprisonment. See N.M.S.A. § 31-18-15(A). Thus, even if this violation were Chavez' first offense, engaging in this conduct constitutes a Grade A violation, because it is a State offense

---

[20]The Court notes, but does not consider, Robinson's assertion that some of the sellers told the officers' confidential informants that they would sell drugs on Chavez' behalf, see Tr. at 54:20-23 (Robinson), because these double-hearsay statements do not have sufficient indicia of reliability for the Court to rely on their veracity.

punishable by a term of imprisonment exceeding one year that is a controlled substance offense.
See U.S.S.G. § 7B1.2(a)(1).

### C. THE COURT CONCLUDES THAT CHAVEZ DID NOT COMMIT A VIOLATION OF POSSESSION WITH INTENT TO DISTRIBUTE PSILOCYBIN MUSHROOMS.

The United States next alleges that Chavez committed another State crime by possessing psilocybin mushrooms with the intent to distribute them.  See Petition at 1.  The Court begins by noting that the State law which the Petition alleges Chavez violated is § 30-31-20(A)(3) and (B)(2).  See Petition at 1.  This section does not apply to Chavez' alleged conduct, however, because it applies only to the possession with intent to distribute a controlled substance  or a controlled substance analog "enumerated in Schedule I or II that is a narcotic drug," or to methamphetamine and its derivatives.  N.M.S.A. § 30-31-20(A)(3) (emphasis added).  See State v. Reams, 1981-NMCA-158, ¶ 2, 98 N.M. 372, 648 P.2d 1185 (concluding that quaalude is not a narcotic drug under the Controlled Substances Act); State v. Mabrey, 1975-NMCA-098, ¶ 6, 88 N.M. 227, 539 P.2d 617 (concluding that marijuana similarly is not a narcotic drug).  Psilocybin is a Schedule I drug included in the list of scheduled hallucinogenic substances.  See N.M.S.A. § 30-31-6(C)(14).  Schedule I also includes separate lists for opiates and opium derivatives.  See N.M.S.A.  §§ 30-31-6(A)-(B).   Section 30-31-2 defines "narcotic drug" for the Controlled Substances Act's purposes to mean:

(1)    opium and opiate and any salt, compound, derivative or preparation of opium or opiate;

(2)    any salt, compound, isomer, derivative or preparation that is a chemical equivalent of any of the substances referred to in Paragraph (1) of this subsection, except the isoquinoline alkaloids of opium;

(3)    opium poppy and poppy straw, including all parts of the plant of the species Papaver somniferum L. except its seeds; or

> (4)      coca leaves and any salt, compound, derivative or preparation of coca leaves, any salt, compound, isomer, derivative or preparation that is a chemical equivalent of any of these substances except decocainized coca leaves or extractions of coca leaves that do not contain cocaine or ecgonine;

N.M.S.A. § 30-31-2(M).   Because hallucinogens are listed separately from opiates and opium derivatives, and because psilocybin is not derived from coca leaves, it therefore is not a narcotic drug, and § 30-31-20(A)(3) is not the appropriate statute under which to charge Chavez.   The more appropriate statute is § 30-31-22(A)(2), which makes it unlawful to possess with intent to distribute "any other controlled substance enumerated in Schedule I . . . except a substance enumerated in Schedule I or II that is a narcotic drug . . . ."   N.M.S.A. § 30-31-22(A)(2).

Regardless under which statute Chavez' alleged conduct falls, the Court concludes that the United States has not shown by a preponderance of the evidence that Chavez possessed psilocybin mushrooms.   The United States concedes that this argument is a weak one.   See Tr. at 94:7-13 (Burkhead).   In support for the conclusion that Chavez possessed psilocybin mushrooms, the United States presented Robinson's testimony that he believed he found "magic mushrooms."   Findings of Fact, supra ¶ 100, at 15 (quoting Tr. at 49:7-24 (Burkhead, Robinson)).   Although he asserted at the hearing that they were psychedelic mushrooms and an illegal substance, he could not remember their name without prompting from counsel.   See Tr. at 49L16-22 (Burkhead, Robinson).   Robinson did not field test the mushrooms, nor could he remember at the hearing the weight of the mushrooms that he found.   See Findings of Fact, supra ¶ 101, at 15 (citing Tr. at 65:20-21 (Robinson)); .Tr. at 50:3-5 (Burkhead, Robinson).   Without more evidence, the Court does not conclude that the United States has shown by a preponderance of the evidence either that Chavez possessed psilocybin mushrooms or that he possessed psilocybin mushrooms with intent to distribute.

**D.    THE    COURT    CONCLUDES    THAT    CHAVEZ    USED    DRUG PARAPHERNALIA.**

The United States last alleges that Chavez committed a State crime by possessing drug paraphernalia in violation of § 30-31-25.1(A).   See Petition at 1.   In relevant part, § 30-31-25.1(A) makes it unlawful to "use or possess with intent to use drug paraphernalia to . . . pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of the Controlled Substances Act."   N.M.S.A. § 30-31-25.1(A).   This prohibition does not apply to some paraphernalia which an individual possesses in accordance with the Harm Reduction Act, N.M.S.A. §§ 24-2C-1 to -6.[21]   See N.M.S.A. § 30-31-25.1(A).   The United States asserts that Chavez possessed paraphernalia in the form of the bag with methamphetamine residue in the truck, the syringes in Williams' purse, the other syringes in the bedroom, and pipes in the bedroom.   See Tr. at 98:1-99:3 (Court, Burkhead).

The Court concludes that the bags' presence in Chavez' truck support a conclusion by a preponderance of the evidence that Chavez used drug paraphernalia, but concludes that there is not sufficient evidence to conclude by a preponderance of the evidence that he used the syringes or the pipes.   Regarding the bags, the Court notes first that, although Chavez disputes whether the officers were authorized to search the car and questions whether any of the contraband which they found during the search of the truck and home are contraband at all, given the lack of corroborating photographs, he does not dispute specifically that the bags in the car belonged to Chavez or, as with the syringes and pipes, that they belonged to someone else.   See Tr. at

---

[21]The Harm Reduction Act directs the New Mexico Department of Health to establish a harm reduction program designed "to reduce overdose mortality and other negative health outcomes associated with drug use."   N.M.S.A. § 24-2C-4.   The program provides participants with, for example, sterile hypodermic syringes in exchange for used hypodermic syringes, drug testing supplies, drug-use safety education, and referral services.   See N.M.S.A. § 24-2C-5.

111:15-115:19 (Gallegos).  Chavez was the truck's owner and driver.  See Findings of Fact, supra ¶ 24, at 5 (citing Tr. at 11:24-12:3 (Burkhead, Fillmore); id. at 39:21-34 (Burkhead, Robinson)); Findings of Fact, supra ¶ 33, at 6 (citing Tr. at 12:14-18 (Fillmore)).  Thus, although there was a passenger in the truck for part of Chavez' flight, see Findings of Fact, supra ¶ 50, at 8 (citing Tr. at 17:22-25 (Fillmore)), that he owned and was driving the truck supports a conclusion, by a preponderance of the evidence, that he was aware of the truck's contents and exercised control over them, see State v. Garcia, 2005-NMSC-017, ¶ 13, 138 N.M. 1, 116 P.3d 72.

The Court also concludes that these bags were for the purpose of packing, repacking, storing, or containing methamphetamine, a controlled substance.  See N.M.S.A. § 30-31-25.1(A).  Robinson found a larger bag that was suitable for containing larger quantities of drugs and smaller bags which were suitable for the distribution of smaller quantities.  See Findings of Fact, supra ¶¶ 117-122, at 17 (citing Tr. at 52:13-20 (Robinson); id. at 53:9-14 (Burkhead, Robinson)).  Robinson field tested the larger bag, that returned a presumptively positive result for methamphetamine, see Findings of Fact, supra ¶ 120, at 17 (citing Tr. at 52:18-20 (Robinson)), and which the Court concludes indicates that Chavez used it for the purpose of packing or storing methamphetamine, see Findings of Fact, supra ¶ 123, at 17.  Accordingly, the Court concludes that these bags constitute drug paraphernalia, see Findings of Fact, supra ¶ 124, at 17, and that the United States has shown by a preponderance of the evidence that Chavez committed a State crime by using drug paraphernalia in violation of § 30-31-25.1(A).[22]

---

[22]To the extent that Chavez argues that the officers' search of the truck was an improper search without a constitutional basis and suggests that the Court should not consider the evidence which the officers discovered, the Court will not suppress that evidence.  Supervised release hearings are subject to lower standards than trial proceedings.  See, e.g., United States v. Henry,

Regarding the syringes and pipes, the Court concludes that there is not sufficient evidence to show that Chavez had constructive possession over those items in the home.  First, Robinson found two syringes with heroin residue on them in Williams' purse under the bed.  <u>See</u> Findings of Fact, <u>supra</u> ¶¶ 91-92, at 14 (citing Tr. at 46:15-16 (Robinson); <u>id.</u> at 62:23-63:7 (Gallegos, Robinson)); Findings of Fact, <u>supra</u> ¶¶ 98-99, at 15 (citing Tr. at 51:17-19 (Robinson)).  The United States has provided no other indication that Chavez exercised control over her bag's contents or that he knew the purse was under the bed.  Second, Robinson found

---

852 F.3d at 1206 (explaining that the Federal Rules of Evidence do not apply to revocation proceedings); 18 U.S.C. § 3583(e)(3) (requiring the Court to make factual determinations by a preponderance of the evidence and not beyond a reasonable doubt).  Regarding the exclusionary rule -- which requires suppression of illegally obtained evidence -- the Supreme Court has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials." <u>Pennsylvania Bd. of Probation & Parole v. Scott</u>, 524 U.S. 357, 363 (1998)(citing <u>United States v. Leon</u>, 468 U.S. 897, 909 (1984); <u>United States v. Janis</u>, 428 U.S. 433, 447 (1976))(declining to extend the exclusionary rule to parole revocation hearings, and explaining that the Supreme Court has declined to extent the exclusionary rule to grand jury proceedings, civil tax proceedings, and civil deportation proceedings).  Although the Tenth Circuit has not discussed whether the exclusionary rule applies to supervised release revocation hearings, it has declined to extend the exclusionary rule to federal probation revocation proceedings, explaining:

> We agree with and underscore the conclusion of the Third Circuit that application of the exclusionary rule to revocation proceedings will not achieve the deterrent effect behind the rule.  That observation is particularly true where, as here, the allegedly offensive seizure is conducted by state officers as a prelude to the filing of state charges.  Because the deterrence to illegal police conduct, if any, can be accomplished within the framework of the state proceeding, application of the exclusionary rule to a parallel federal revocation proceeding would be redundant.  Moreover, as noted by the Third Circuit, application of the exclusionary rule at this stage would not achieve a deterrence as much as it would inhibit the interests of the public in the pursuit of its protection against "convicted criminals who have abused the liberty afforded them."

<u>United States v. Finney</u>, 897 F.2d 1047, 1048 (10th Cir. 1990)(citing <u>United States v. Bazzano</u>, 712 F.2d 826, 831 (3d Cir. 1983)).  The Court concludes that similar factors are at play in the supervised-release context and will not extend the exclusionary rule to suppress evidence presented at a supervised release revocation hearing.

other syringes and pipes elsewhere in the bedroom.  See Findings of Fact, supra ¶ 107, at 16 (citing Tr. at 51:11-14 (Burkhead, Robinson)).  The United States did not present evidence about what these pipes looked like, or whether, in Robinson's experience, for example, they were associated with drugs at all.[23]  The United States also did not present evidence where in the bedroom the pipes were located.  To the extent that the Court above concludes that Chavez exercised constructive control over the methamphetamine bundle in the bedroom, it reaches that conclusion because Robinson located the bundle inside of a suit jacket sleeve inside the closet with other items of clothing belonging to Chavez.  See supra at 42.  This "close proximity to [Chavez'] belongings," State v. Brietag, 1989-NMCA-019, ¶¶ 12, 14, 108 N.M. 368, 772 P.2d 898, supports the Court's conclusion that he constructively possessed the methamphetamine bundle, but the United States has not presented similar evidence with respect to the pipes and syringes.  Accordingly, the Court concludes that the United States has not shown by a preponderance of the evidence that Chavez possessed the syringes and pipes inside the home.

In New Mexico, a person who violates possession of drug paraphernalia under § 30-31-25.1(A) "shall be issued a penalty assessment . . . and is subject to a fine of fifty dollars ($50.00)."  N.M.S.A. § 30-31-25.1(C).  A violation of this statute therefore constitutes a Grade C violation.  See U.S.S.G. § 7B1.2(a)(3).  Because the Court concludes that the United States has shown by a preponderance of the evidence that Chavez engaged in aggravated fleeing a law enforcement officer, possession with intent to distribute methamphetamine, and use of drug

---

[23]In response to the Court's questioning during argument, the United States expressed that individuals can smoke some of the drugs found in the home and indicated that, because it lacked discovery, it could not show what the pipes looked like, but explained they were small glass pipes associated with smoking methamphetamine.  See Tr. at 99:2-100:21 (Court, Burkhead).

paraphernalia, the Court concludes that Chavez violated his supervised release condition that he not commit another federal, State, or local crime.  See Petition at 1.

## II.    THE COURT CONCLUDES THAT CHAVEZ VIOLATED HIS SUPERVISED RELEASE CONDITION THAT HE NOT UNLAWFULLY POSSESS A CONTROLLED SUBSTANCE.

The United States also alleges that Chavez violated a second condition, namely that he not unlawfully possess a controlled substance.  See Petition at 2.  As the Court discusses above, it concludes that Chavez violated his supervised release condition by possessing with intent to distribute methamphetamine.  See supra at 44.  Accordingly, the Court concludes that Chavez also violated the condition that he not unlawfully possess a controlled substance.  Because that conduct is punishable by a term of imprisonment exceeding one year and is a controlled substance offense, it constitutes a Grade A violation.  See N.M.S.A. §§ 30-31-20(B), 31-18-15(A); U.S.S.G. § 7B1.1(a)(1).

The Court also notes that Robinson found pills in Chavez' truck, one of which was on the driver's seat and one of which was on the central console.  See Findings of Fact, supra ¶ 115, at 17 (citing Tr. at 52:6-12 (Robinson)).  These pills were marked M and 30, consistent with fentanyl, and tested presumptively positive for fentanyl.  See Findings of Fact, supra ¶¶ 115-116, at 17 (citing Tr. at 52:6-12 (Robinson); id. at 52:21-24 (Burkhead, Robinson)).  The Court concludes, based on the pills' location in Chavez' truck, that he possessed them.  See State v. Garcia, 2005-NMSC-017, ¶ 22, 138 N.M. 1, 116 P.3d 72 ("The most important link between the gun and Defendant was the ammunition clip.  The clip was sizeable, located on top of Defendant's seat, and Defendant had been sitting on it . . . .  Defendant was clearly exercising control over the clip . . . .").  In New Mexico, fentanyl is a Schedule II drug.  See N.M.S.A. § 30-31-7(a)(2)(f).  New Mexico law makes it unlawful to "intentionally possess a controlled

substance unless the substance was obtained pursuant to a valid prescription . . . or except as otherwise authorized by the Controlled Substances Act."  N.M.S.A. § 30-31-23.  Chavez does not argue that he had a valid prescription for the fentanyl or that the Controlled Substances Act authorizes his possession otherwise.  "A person who violates [§ 30-31-23] with respect to any amount of any controlled substance enumerated in Schedule I, II, III or IV . . . is guilty of a misdemeanor and shall be punished by a fine . . . or by imprisonment for a definite term less than one year, or both."  N.M.S.A. § 30-31-23(D).  Because New Mexico law would punish Chavez' possession with less than a year of imprisonment, this violation constitutes a Grade C violation. See U.S.S.G. § 7B1.1(a)(3).

In summary, the Court concludes that Chavez violated both of the relevant supervised release conditions, i.e., that he not commit another federal, State, or local crime, and that he not unlawfully possess a controlled substance.  Chavez' violation of § 30-31-20(A)(3) for possessing methamphetamine with intent to distribute is a Grade A violation.  See U.S.S.G. § 7B1.1(a)(1). Chavez' violation of § 30-22-1.1 for aggravated fleeing a law enforcement officer is a Grade B violation.  See U.S.S.G. § 7B1.1(a)(2).  Chavez' violation of § 30-31-25.1(A) for use of drug paraphernalia and his violation of the condition that he not unlawfully possess a controlled substance are Grade C violations.  See U.S.S.G. § 7B1.1(a)(3).  In reaching the applicable Guideline revocation range of imprisonment, the Court looks to the most serious violation's grade, here, a Grade A violation.  See U.S.S.G. § 7B1.1(b).  The Court also relies on Chavez' criminal history category at the time of his sentencing, see U.S.S.G. § 7B1.4(a), which was V, see Presentence Investigation Report ¶ 73, at 16, filed March 16, 2016 (Doc. 30)("PSR"). Accordingly, the Guidelines establish a revocation imprisonment range of 30 to 37 months.  See U.S.S.G. § 7B1.4(a)(1).  Because Chavez' underlying conviction was for a Class C felony,

however, § 3583(e)(3) establishes a maximum revocation term of imprisonment of 2 years.  See 18 U.S.C. § 3583(e)(3); PSR ¶ 75, at 16.  Accordingly, Chavez' revocation imprisonment range is 24 months.

   **IT IS ORDERED** that: (i) Defendant Pete Pasqual Chavez has violated State criminal law while on supervised release; (ii) he has violated his mandatory condition that he must not commit another federal, State, or local crime; (iii) he has violated his mandatory condition that not unlawfully possess a controlled substance; (iv) Chavez thus has committed a Grade A violation of his term of supervised release; and (v) Chavez' applicable term of imprisonment upon the revocation of his supervised release term is 24 months.

                                        _____
                                        UNITED STATES DISTRICE JUDGE

*Counsel:*

Alexander M. M. Uballez
   United States Attorney
Jack Burkhead
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Michael R. Jones
Clark, Jones & Ruyle, LLC
Santa Fe, New Mexico

       *Attorney for the Defendant*